## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 7 |
| MUNIVEST SERVICES, LLC *et al.*, | Case No. 10-71403-pjs<br>(Jointly Administered) |
| Debtors. | Hon. Phillip J. Shefferly |

_____/

| | |
|---|---|
| GENE R. KOHUT, CHAPTER 7<br>TRUSTEE, | Adv. Pro. No. 12-05905-pjs |
| Plaintiff, | |
| v. | |
| MGM GRAND DETROIT, LLC, | |
| Defendant. | |

_____/

### MGM GRAND DETROIT, LLC'S RESPONSE TO TRUSTEE'S MOTION TO COMPEL

In response to the Trustee's motion to compel (Docket No. 24), Defendant MGM Grand Detroit, LLC ("MGM") responds as follows:

1.      MGM's written discovery responses to date are more than adequate to satisfy the requirements of Fed. R. Bankr. P. 33.  MGM timely answered all nine interrogatories initially posed by the Trustee to the best of its ability, and has produced the records in its possession (constituting several hundred pages) responsive to the Trustee's 13 initial document requests.  MGM has also twice supplemented its written discovery responses to provide extensive additional details and clarifications requested by the Trustee (*see* Exhibit A, May 30, 2013 letter from MGM's counsel to the Trustee's counsel; Exhibit B, July 3, 2013 letter from MGM's counsel to the Trustee's counsel), which MGM believed in good faith would be sufficient to satisfy the Trustee and resolve this

motion until MGM was informed just a few days ago that the Trustee is still not satisfied as to the adequacy of MGM's responses to his Interrogatory Nos. 1, 2, 4, 5 and 7.

2.       Moreover, MGM is currently in the process of timely responding to an additional 12 requests to admit, an additional 12 interrogatories (structured as a single interrogatory by the Trustee), and an additional request for documents served on MGM by the Trustee just a few weeks ago.

3.       In short, MGM has complied with its discovery obligations to date and will continue to do so. Not only has it responded to all of the written discovery posed to it to the best of its ability, but it has on numerous occasions offered up its employees for depositions so that the Trustee can more thoroughly explore and better understand MGM's records. The Trustee has thus far chosen not to take MGM up on any such offers. In fact, the Trustee has yet to take a single deposition in this adversary proceeding to try to actually understand the extensive records that have already been produced, both by MGM and by non-parties.[1]

4.       As the Trustee is acutely aware, this is not your typical Section 548 case where the debtor is accused of "gifting" some money or property to a relative. Factually, this is a very complicated case and discovery is therefore likewise complicated.[2] The case involves Debtor Dante DeMiro having lawfully gambled at MGM on more than 100 occasions over a period of nearly three years between 2008 and 2010, sometimes winning and sometimes losing. MGM has produced what records it has related to these activities and has explained its position, both in interrogatory

---

[1] MGM also offered to extend the discovery deadline in order to allow additional time for depositions.

[2] Legally, MGM believes that this case will ultimately be resolved in its favor pursuant to *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769 (6th Cir. 1995).

responses and otherwise, regarding these activities to the best of its ability.  There is simply nothing more to compel from MGM.[3]

5.      Unfortunately, the Trustee's continued pursuit of this motion appears to be based on two things, neither of which form a proper basis for a motion to compel:  First, the Trustee having posed a series of "contention" interrogatories to MGM and then not liking MGM's contentions; second, the Trustee improperly expecting MGM to be able to explain to the Trustee purported "facts" in the Trustee's own complaint which MGM denies in the first place and which are based on a misreading of certain subpoenaed records.

6.      Interrogatory No. 1 is an example of the first.  In Interrogatory No. 1, MGM was asked to state the basis of its contention that it provided reasonably equivalent value in exchange for every transfer made to MGM by any of the debtors.  MGM initially responded:

> MGM states that the basis is *Allard v. Flamingo Hilton (In re Chomakos)*, 69 F.3d 769 (6th Cir. 1995) and similar cases, as well as the fact that the total estimated revenue earned by MGM from the gambling activities at issue was only $87,906, not the $367,176 sought by the Trustee.

MGM subsequently supplemented this response as follows:

> [T]he following evidence, which is of the type that was found to support reasonably equivalent value in the *Allard* case, supports MGM's contention that it provided reasonably equivalent value in this case:  (1) gambling at MGM is a regulated activity; (2) regulation extends to payout ratios for both slot machines and table games; (3) MGM depends on repeat business, which is encouraged by customers winning; (4) competition among casinos for customers is intense; (5) small bets can result in large winnings; (6) the "house" generally only has a slight advantage over table

---

[3] This is not a case of a defendant trying to thwart a full and open discovery process.  MGM desires full and open discovery.  Indeed, the discovery taken to date has already demonstrated that MGM received less than a quarter of the $367,000 in "transfers" from Dante DeMiro that the Trustee's complaint alleges were received by MGM – an allegation that it has turned out had no basis in DeMiro's or the other debtor entities' own financial records and was merely based on a "guess" (an incorrect guess, it turns out) by the Trustee as to what certain documents, subpoenaed pre-lawsuit, meant.

3

players with fair knowledge of the games they are playing; and (7) the Player Report on DeMiro shows that he often won large sums of money at MGM tables through his gambling activities (for example: 11/22/08- $3,500; 2/22/09- $16,300; 4/11/09- $3,700; 12/10/09- $4,000; 12/14/09- $4,700; 12/24/09- $8,600; 4/23/10- $7,800; 4/27/10- $6,500; 4/30/10- $9,600; 5/17/10- $9,500; 7/29/10- $9,500; 9/10/10- $9,300).

MGM subsequently supplemented this response even further as follows:

MGM provided value to DeMiro for the $87,906 gambling loss to MGM, including, but not limited to, in the form of enforceable contract rights for bets placed at the time they were placed. MGM also has evidence of tens of thousands of dollars in "comps," free-plays and other benefits extended to DeMiro in exchange for his gambling activity at MGM, and will shortly be producing the records evidencing such comps and other benefits. MGM submits that under *Allard* the contract rights alone constitute actually equivalent value as a matter of law, but taken together with the comps and other benefits extended to DeMiro equivalent value was certainly provided. MGM estimates the value provided to DeMiro as equaling or exceeding $87,906, but to the extent this is a factual question leaves the valuation determination to the finder of fact.

To the extent the Trustee still seeks to attempt to prove that the MuniVest entities transferred money to MGM (despite what has been set forth above), MGM's position is that any transfers from the MuniVest entities, if any, would have necessarily been made first to DeMiro, either in the form of ATM withdrawals or GCA advances against Munivest accounts, and then from DeMiro to MGM in the form of loss on bets placed *with that same money* (assuming the Trustee can successfully trace through this process). Thus, under 11 U.S.C. § 550, MGM would be a secondary transferee and need not demonstrate value to the MuniVest entities themselves so long as DeMiro received value.

There is simply nothing inadequate about this response, particularly as supplemented, and there is nothing more to compel from MGM in regards to it. The Trustee simply does not like MGM's response.

7.      Interrogatory No. 5 is an example of the second. In Interrogatory No. 5, MGM was asked to "identify and describe the circumstances of each transfer [listed on Exhibit A to the Trustee's Complaint]"— which was a spreadsheet compiled by the Trustee purportedly based on

DeMiro's bank records, not MGM's records – "by Debtors to MGM, including what the transfer

was for . . . . and which Debtor made the transfer to MGM." MGM initially responded:

> MGM objects to this request as unduly burdensome and because the Trustee, not MGM, compiled Exhibit A to the Complaint as a purported summary of transfers, and therefore presumably has in his possession the underlying records to support Exhibit A. Subject to this objection, MGM states that it cannot at this time identify and describe the "circumstances" of each alleged transfer listed on Exhibit A of the Complaint.

MGM subsequently extensively supplemented this response as follows:

> The Trustee has the burden of proving that MGM received transfers from DeMiro and/or the Munivest entities (collectively, the "Debtors") in the first place before it is even necessary to reach the issue of whether the transfers were fraudulent. The Trustee has alleged that MGM received $367,176.57 in transfers, at least $96,721.61 of which the Trustee alleges was transferred by the Munivest entities, with the balance having been transferred by DeMiro. The Trustee's purported evidence of these transfers are: (1) bank records of DeMiro and the Munivest entities, from which the Trustee concludes that the Debtors transferred $118,176.57 to MGM; and (2) MGM's "Player Report" on DeMiro, which shows "cash in" of $249,000. The Trustee then, simplistically, takes these two numbers, adds them together, and arrives at $367,176.57.
>
> The Trustee's case is based on a serious misunderstanding of the records on which he is relying. First, the bank records do not evidence $118,176.57 in transfers from the Debtors to MGM. Rather, the bank records only evidence transfers that DeMiro made to himself from his and the Munivest entities' accounts using both traditional bank ATM's and "Global Cash Access" ("GCA") machines located at MGM. The following are intended to be illustrative examples only:
>
> 1. 11/10/08 – DeMiro's Michigan First Credit Union bank statement shows "Withdrawal Debit Card" in the amount of $343.85." Below the entry it states "11/07 26831400004036645 554184 MGM Grand Detroit". The Trustee has included this sum in his calculation of purported transfers from DeMiro to MGM (see Complaint, Ex. A p. 9) but this is not a transfer to MGM. Rather, this evidences that on 11/7/08 DeMiro withdrew money from his own account at a bank ATM located at MGM, which he then could have walked out the door with and spent anywhere, or simply put in his pocket. Note that the reason for the odd number is that

DeMiro was charged a bank ATM fee by the bank for use of the ATM, which such fee itself went to the bank and not MGM.

2.      The analysis stated in #1 applies to every single entry in the Debtors' bank records which does not include the term "GCA." In all such cases DeMiro used traditional bank ATMs located at MGM to transfer money to himself, which he then could have spent anywhere. The Trustee has wrongly included all of these entries in his calculation of the $118,176.57 (see Complaint, Ex. A pp. 1-25) when none of them should be included.

3.      11/24/08 – DeMiro's Michigan First Credit Union bank statement shows "Withdrawal Debit Card" in the amount of $1,054.50." Below the entry it states "11/23 0283280000005536 542560 GCA* MGM Grand Detroit". The Trustee has included this sum in his calculation of purported transfers from DeMiro to MGM (see Complaint, Ex. A, p. 9) but this also is not a transfer to MGM. Rather, this evidences that on 11/23/08 DeMiro used a GCA machine located at MGM to take an advance of $1,000 against his bank account. The other $54.50 was the service fee for this advance charged by Global Cash Access, Inc., a company unaffiliated with MGM which places GCA machines at casinos. The service fee goes to Global Cash Access and not MGM. The GCA machine would have provided DeMiro with a slip that he could then redeem at an MGM cage either for $1,000 in cash or $1,000 in chips. Again, as with DeMiro's withdrawals from ATMs, there was no transfer from DeMiro to MGM. Rather, DeMiro was transferring money or its equivalent to himself.

4.      The analysis stated in #3 applies to all entries in the Debtors' bank records which include the term "GCA" and in which it is clear that a service fee of approximately $54.50/per $1,000 advanced was charged. Because GCA machines can also be used like traditional ATMs, there are also entries in the Debtors' bank records which include the term "GCA" but in which DeMiro was simply withdrawing cash from a GCA machine as if at a traditional ATM (see, e.g., 12/28 – MuniVest Financial Group, Inc. bank statement showing a GCA "Non-NC ATM Cash Withdrawal" of $502.75, indicating that DeMiro withdraw $500 and was charged a traditional ATM fee of $2.75). In either case, these entries do not evidence transfers to MGM. The Trustee has wrongly included all of these entries in his calculation of the $118,176.57 (see Complaint, Ex. A pp. 1-25) when none of them should be included.

The second factor in the Trustee's calculation of purported transfers is likewise based on a serious misunderstanding of the record on which he is relying – in this case the Player Report. The "cash in" amount of $249,000 which the Trustee is treating as a

6

transfer to MGM does not represent a transfer to MGM. In order to arrive at an actual dollar value of transfers from DeMiro to MGM based on the Player Report, one would need to look at the "Est. Win/Loss" column showing a total of -$87,906. This estimate is arrived at using standard casino industry win/loss estimation methods and algorithms, and MGM submits that it is the best available evidence of the actual amount DeMiro lost gambling at MGM's tables during the time period in question. Thus, in the Trustee's best case scenario, he can only demonstrate $87,906 in actual transfers from DeMiro to MGM. To the extent the Trustee intends to claim that all or part of this $87,906 in transfers were transfers by the MuniVest entities rather than by DeMiro himself, MGM submits that there is no evidence or available tracing method by which the Trustee will be able to substantiate such a claim.

Again, there is nothing inadequate about this response, particularly as supplemented, and there is nothing more to compel from MGM in regards to it.

8.      MGM has no obligation under the Federal Rules to further explain the Trustee's own case, or MGM's position regarding his case, to the Trustee (although in a failed effort to resolve this motion MGM did attempt to do so in Exhibit B). Rather, MGM has produced what evidence it has and answered his interrogatories as fully as it can and to the best of its ability. Accordingly, MGM respectfully requests that the motion be denied.

**WHEREFORE**, MGM respectfully requests that the Trustee's motion be denied, that MGM be granted costs and attorney fees, and that the Court grant such further relief as it deems just and equitable.

Respectfully submitted,

Dated: July 16, 2013                    DICKINSON WRIGHT PLLC

By: */s/ Doron Yitzchaki*
Michael C. Hammer (P41705)
Doron Yitzchaki (P72044)
350 S. Main Street, Suite 300
Ann Arbor, MI 48104
Telephone: (734) 623-7075
Facsimile: (734) 623-1625

mhammer@dickinsonwright.com
dyitzchaki@dickinsonwright.com
*Counsel for MGM Grand Detroit, LLC*

ANNARBOR 26251-162 164645v2

## CERTIFICATE OF SERVICE

On July 16, 2013 I filed the foregoing, together with all of its exhibits and attachments,

with the Court using the ECF system, which will send notification of the filing to all counsel of

record in this matter.

By: */s/ Doron Yitzchaki*
Doron Yitzchaki (P72044)